**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **ROBERT LEE BARNES,** | ) | |
| Plaintiff, | ) | **Case No. 7:20-cv-00635** |
| | ) | |
| **v.** | ) | |
| | ) | **By: Michael F. Urbanski** |
| **BENNY MULLINS, et al.,** | ) | **Chief United States District Judge** |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION**</u>

Robert Lee Barnes, a Virginia inmate proceeding <u>pro se</u>, filed this civil action under 42 U.S.C. § 1983, alleging violations of his Eighth Amendment right to receive adequate medical care while incarcerated. The case is presently before the court on (1) the motion for summary judgment filed by Dr. Benny Mullins and Dr. Happy Smith, ECF No. 37; (2) Barnes's motion for summary judgment against Dr. Mullins, ECF No. 51; and (3) Barnes's motion for summary judgment against Dr. Smith, ECF No. 65. For the reasons set for below, the motion for summary judgment filed by Dr. Mullins and Dr. Smith is **GRANTED**, and Barnes's motions for summary judgment are **DENIED**.

## I. Factual Background

Dr. Mullins has been the staff physician at Wallens Ridge State Prison ("Wallens Ridge") since September 6, 2016. Mullins Decl., ECF No. 38-1, at ¶ 2. Dr. Smith has been the staff physician at Pocahontas Correctional Center since the spring of 2020. Smith Decl., ECF No. 38-2, at ¶ 2. Prior to that, Dr. Smith worked with Dr. Mullins at Wallens Ridge. <u>Id.</u>

Barnes has been in the custody of the Virginia Department of Corrections ("VDOC") since July 28, 2010. He transferred from Sussex II State Prison to Wallens Ridge on November 30, 2018. During an intake assessment performed by a registered nurse, Barnes reported that he had been injured during a fight at his previous institution. See VDOC-02,[1] Defs.' Br. Supp. M. Summ. J. Ex. 3, ECF No. 38-3. The nurse observed wounds on his left lower shin, right kneecap, and right forearm, all of which were in the healing stage. Id. Although Barnes also complained of back pain, the nurse noted that there were no visual injuries on his back and that he appeared to have no difficulty ambulating. Id. Following the assessment, the nurse entered intake orders from Dr. Smith for Baclofen and Mobic.[2] VDOC-03.

On December 11, 2018, Barnes presented to Dr. Mullins for a new intake evaluation. VDOC-04. Barnes reported having a history of bronchitis, scoliosis, and tight muscles. Id. As part of the physical examination findings, Dr. Mullins noted a questionable back curvature. Id. He extended Barnes's Mobic prescription for 180 days. Id.

On December 31, 2018, Barnes was seen by a registered nurse. VDOC-05. He reported experiencing "a lot of back pain [and] spinal issues," and asserted that he had lost range of motion in his thoracic muscles. Id. He advised the nurse that physical therapy was helpful in the past but that none of the medications he had taken were effective. Id. The nurse noted

---

[1] When citing to the compilation of medical records available at ECF No. 38-3, the court will use the Bates numbering found in the lower-right corner of the documents.

[2] Baclofen is a skeletal muscle relaxant used to treat muscle stiffness and tightness. See National Library of Medicine, MedlinePlus, https://medlineplus.gov/druginfo/meds (last visited Mar. 31, 2022). Mobic (meloxicam) is a nonsteroidal anti-inflammatory drug ("NSAID") prescribed to relieve pain, tenderness, swelling, and stiffness. Id.

that Barnes exhibited no signs of acute distress and that his gait was steady. Id. She referred Barnes to a physician for further evaluation. Id.

On January 9, 2019, Barnes was examined by Dr. Smith with regard to his complaint of scoliosis. Id. During the examination, Barnes reported that his muscles were tight and that he had lost range of motion in his thoracic spine. Id. He informed Dr. Smith that "Flexeril doesn't work" and that none of the other medications he had tried provided any relief. Id. Barnes reported that a physical therapist had advised him that he needed a heating pad and a foam mattress, and that he should undergo a thoracic x-ray if he loses range of motion. Id. Dr. Smith reviewed the results of December 2016 x-rays with Barnes, which revealed no scoliosis. Smith Decl., ECF No. 38-2, at ¶ 19. Dr. Smith explained the x-ray findings of arthritis and how arthritis can affect muscle tone. Id. Following the examination, Dr. Smith ordered cervical, thoracic, and lumbar spine x-rays, and noted that he was going to refer Barnes to a neurologist "pending x-ray." VDOC-006. He also noted that he would follow up regarding an MRI and that he wanted to try to find a medication that would alleviate Barnes's discomfort. Id. Dr. Smith then drafted a detailed summary of Barnes's existing medical records. VDOC-007–008.

On January 11, 2019, Barnes underwent the spinal x-rays ordered by Dr. Smith. VDOC-009. He saw Dr. Mullins for a follow-up appointment on January 28, 2019. Id. Dr. Mullins advised Barnes that the x-rays were negative for any findings of scoliosis. Id. Nonetheless, Dr. Mullins ordered that a consultation request be submitted for an orthopaedic evaluation. Id. Several days later, Barnes's prescription for Mobic was discontinued at his request. Id.

On February 8, 2019, a QMC Consultation Request was opened for an orthopaedic consult. VDOC-049. Dr. Mullins subsequently recorded two specific questions for the orthopaedic specialist:

> (1) Does [Barnes] have scoliosis, functional or structural?
>
> (2) Does he need any treatment? He is demanding heating pad, special bed, heat, etc. Keep in mind, this is a prison and these are not available.
>
> Please send x-ray reports also.

VDOC-010.

On February 5, 2019, Dr. Mullins followed up on the request for an orthopaedic consult and inquired as to whether there were any orthopaedic specialists in the area who could see Barnes. Id. On February 28, 2019, VDOC Health Services provided the following response:

> Recommend providing the offender with ROM exercises for his back. Consider alternative NSAID or Tylenol if he continues to complain of pain. Consider analgesic balm. Also consider course of prednisone if he continues to complain and there is no contraindication.

VDOC-050. In accordance with the recommendations, Dr. Mullins ordered that Barnes receive an "[e]xercise sheet for back." VDOC-010.

On March 14, 2019, Barnes saw Tyler Kemp, P.A., for a consultative orthopaedic evaluation at Carilion Clinic's Institute for Orthopaedics and Neurosciences. VDOC-053–055. Kemp's report indicates that, on physical examination, Barnes's lumbar region was "tender to palpation in the midline" but he exhibited no pain with flexion or extension. VDOC-054. His gait was stable, his standing posture was balanced, his motor function was intact throughout

4

the bilateral extremities, and he exhibited no sensory deficits in the lower extremities. VDOC-054–055. Kemp noted that additional spinal x-rays revealed "mild thoracolumbar scoliosis apex left without lateral subluxation." VDOC-055. He also noted that the x-rays showed "no significant degeneration" and "[n]o evidence of spondylolysis or spondylolisthesis." Id. When asked about his treatment history, Barnes told Kemp that he had previously experienced significant relief from using a heating pad and a foam roller. Id. Based on the information provided by Barnes, Kemp noted that he would prescribe a heating pad and a foam roller. Id.

On March 25, 2019, Dr. Mullins entered a request for the office notes from Barnes's orthopaedic consult. VDOC-011. He also asked that the staff call Carilion and request alternatives to a heating pad and a foam roller, since inmates were not permitted to possess those items at the prison. Id.

On April 17, 2019, Barnes met with Dr. Smith to discuss the results of the orthopaedic consult. Smith Decl. ¶ 35; VDOC-012. Dr. Smith advised Barnes that he was not permitted to have a heating pad or a foam roller at his particular security level. VDOC-012. Barnes asked to be transferred to a facility that would allow him to have a heating pad and a foam roller. Id. Dr. Smith advised him that the decision regarding a medical transfer would require input from security. Id. Dr. Smith noted that Barnes requested alternative treatment options and that he would follow up on Dr. Mullins's previous inquiry in this regard. Id.

On May 1, 2019, Dr. Smith entered orders for ibuprofen and a foam roller. VDOC-013. Several days later, Dr. Mullins spoke to Kemp regarding the consultative examination. Kemp confirmed that he "found very minimal problems" during his examination of Barnes. Id. When Dr. Mullins explained that security restrictions limit what Barnes is allowed to have

in his cell, Kemp informed Dr. Mullins that Barnes "[d]oes not need a heating pad or anything else except ibuprofen or Tylenol [as needed]." Id. Based on the record of Dr. Mullins's conversation with Kemp, Tina Townsend, RN, rescinded the previous order for a foam roller, noting that it was "not indicated." Id.

On June 17, 2019, Barnes returned to Dr. Mullins for a follow-up appointment. VDOC-015. Dr. Mullins noted that he would ask Dr. Smith to speak to Barnes regarding his request for a medical transfer. Id.

On June 26, 2019, Dr. Smith met with Barnes regarding his continued desire for a medical transfer. Smith Decl. ¶ 45. They "discussed what 'functional scoliosis' is, and [Dr. Smith] explained the results of Dr. Mullins's conversation with . . . Kemp." Id. Barnes continued to request a heating pad and asserted that the prison's medications "don't work." Id. He complained of increased pain and muscle spasms, and again requested a transfer. Id.

Immediately following his conversation with Barnes, Dr. Smith spoke with Dr. Mullins about the case. Id. ¶ 46. The physicians determined that a medical transfer was not necessary because Barnes "was functional and [they] felt [they] could provide the appropriate care at [Wallens Ridge]." Id.; see also Mullins Decl. ¶ 46. That same day, Barnes was prescribed ibuprofen for pain relief. VDOC-016.

On September 12, 2019, after being temporarily transferred to Buckingham Correctional Center for a court proceeding, Barnes returned to Dr. Mullins with complaints

of chronic back pain. VDOC-022. Dr. Mullins noted that Barnes was only 51% compliant with his Motrin (ibuprofen) prescription. Id. No additional treatment was ordered or recommended at that time. Id.; see also Compl., ECF No. 1-1, at ¶ 42 ("Plaintiff asked Dr. Mullins to change his pain medication. However, Dr. Mullins refused because Plaintiff was compliant with his prescription only 51% of the time.").

Barnes saw Dr. Mullins again on September 30, 2019, after Barnes voiced complaints of chronic muscle pain to a nurse. VDOC-023. The physical examination findings were negative with the exception of tenderness in the lower back. Id. Dr. Mullins prescribed Flexeril and Naproxen.[3] Id.

On October 7, 2019, Barnes complained to a nurse that neither of the new medications had provided any pain relief. VDOC-024. Dr. Mullins advised the nurse that Barnes would need to take the medications for a longer period in order to determine their effectiveness. Id.

In December 2019, Barnes continued to complain of back pain and muscle tightness. Id. Dr. Mullins noted that Barnes had been taking his medications regularly at that time. VDOC-025. On physical examination, Barnes exhibited tenderness in his upper back. Id. Dr. Mullins prescribed Flexeril and Elavil (amitriptyline),[4] and instructed Barnes to follow up in 30 days for reevaluation. Id.

On January 15, 2020, Barnes presented to the medical department for an evaluation by Dr. Smith. At that time, Barnes reported new symptoms in his left arm and left leg,

---

[3] Flexeril (cyclobenzaprine) is a skeletal muscle relaxant used to relax muscles and relieve pain. See National Library of Medicine, MedlinePlus, https://medlineplus.gov/druginfo/meds (last visited Mar. 31, 2022). Naproxen is a NSAID prescribed to relieve pain, tenderness, swelling, and stiffness. Id.

[4] Elavil (amitriptyline) is a tricyclic antidepressant that is also used to treat neuralgia or nerve pain. Id.

including numbness and tingling. Smith Decl. ¶ 61; <u>see also</u> VDOC-026. Dr. Smith prescribed a 40-day prednisone taper and discontinued Barnes's prescription for Elavil. Smith Decl. ¶ 61.

Over the next few weeks, Barnes continued to report that his medications were not providing sufficient relief. VDOC-029. He saw Dr. Mullins again on February 20, 2020. <u>Id.</u> Because Barnes had not yet completed the course of prednisone prescribed by Dr. Smith, Dr. Mullins prescribed Flexeril and Naproxen, and instructed Barnes to return in 45 days for a follow-up visit. Mullins Decl. ¶ 64; <u>see also</u> VDOC-029.

During sick call on March 4, 2020, Barnes complained of "neck muscle tightness" and numbness in his arms, legs, and fingers. VDOC-030. He was subsequently examined by Dr. Mullins on March 12, 2020. <u>Id.</u> Dr. Mullins ordered three rounds of lab work and instructed Barnes to return after the lab work was completed. <u>Id.</u>

Barnes saw Dr. Mullins again on April 22, 2020. Mullins Decl. ¶ 71; <u>see also</u> VDOC-033. Dr. Mullins informed Barnes that the results of the completed lab tests were normal. <u>Id.</u> Nonetheless, Barnes "ordered a repeat CBC" out of an abundance of caution. <u>Id.</u> He also made a note to inquire as to whether Barnes could have a foam roller or be transferred to a facility where he would be permitted to possess a heating pad. <u>Id.</u>

In May 2020, Barnes continued to report that his pain medications were ineffective. VDOC-034. On May 19, 2020, Dr. Mullins instructed Barnes to return to see him in two weeks. VDOC-035. In the meantime, Dr. Mullins reviewed relevant treatment notes, including the notes documenting his conversation with Kemp. <u>Id.</u> Dr. Mullins noted that he agreed with Kemp that a foam roller or heating pad was not required. <u>Id.</u> Dr. Mullins also noted that Barnes was not eligible for a transfer. <u>Id.</u>

During a follow-up appointment on June 14, 2020, Barnes complained of pain along his entire spine. VDOC-037. Dr. Mullins ordered a 30-day prescription for Naproxen and instructed Barnes to return to see him in two weeks. VDOC-037.

When Barnes saw Dr. Mullins again on July 8, 2020, he reported that his symptoms had not changed. Id. Dr. Mullins prescribed Robaxin[5] and instructed Barnes to return in three weeks for reevaluation. Id.

Barnes returned to Dr. Mullins on August 3, 2020, after reporting that his back pain was preventing him from sleeping. VDOC-038. Dr. Mullins instructed Barnes to return in two weeks to discuss a possible transfer and referral to physical therapy. Id. A few days later, Dr. Mullins placed the following note in Barnes's medical chart:

> I have offered this patient everything that is available for back pain, which includes PT when it becomes available. He has harassed me with letters to the Board of Medicine. For all concerned, transfer is needed.

Id.

During a subsequent follow-up appointment on August 26, 2020, Dr. Mullins advised Barnes that a transfer was "in [the] works." VDOC-039. He also noted that Barnes does not need a heating pad or a foam roller at Wallens Ridge. Id. Dr. Mullins ordered lab work and instructed Barnes to return as necessary. Id.

Notes from nurses indicate that Barnes continued to complain of back pain over the next few months. VDOC-040–042. On November 19, 2020, Dr. Mullins ordered a ten-day

---

[5] Robaxin (methocarbamol) is a muscle relaxant used to relieve pain and discomfort caused by muscle strains and other muscle injuries. See National Library of Medicine, MedlinePlus, https://medlineplus.gov/druginfo/meds (last visited Mar. 31, 2022).

prescription for Robaxin. VDOC-043. He also restated Barnes's prescription for Elavil and ordered a muscle rub. Id.

Less than two weeks later, Barnes reported that he was unable to apply the muscle rub to his thoracic spine and that it was providing only slight relief in the areas that he could apply it. VDOC-044. Barnes was again referred to Dr. Mullins, who examined him on December 10, 2020. At that point, Dr. Mullins prescribed Flexeril, Motrin, Tylenol, and physical therapy. VDOC-045.

Barnes appeared for his initial physical therapy appointment on December 14, 2020. Id. During the appointment, he inquired about a foam roller or heating pad. Id. The physical therapist educated Barnes about various stretching exercises and noted that the exercises "would be sufficient at this time." VDOC-045–046. Barnes participated in at least three additional sessions before being discharged from physical therapy on December 23, 2020. Mullins Decl. ¶ 91. At that time, the physical therapist noted that Barnes's "maximum potential" had been met. VDOC-196. The physical therapist provided Barnes with a home exercise program and emphasized the importance of completing the recommended exercises in order to maintain flexibility. Id.

On January 13, 2021, Dr. Mullins increased Barnes's Elavil dosage from 25 milligrams to 75 milligrams for 80 days. VDOC-191. Despite this adjustment, Barnes continued to complain of back pain. VDOC-192. During a follow-up appointment on March 3, 2021, Barnes advised Dr. Mullins that he had been doing the stretching exercises recommended by the physical therapist but that "[n]othing helps but [a] roller [and a] heating pad." VDOC-

0304. Dr. Mullins prescribed Robaxin and Motrin, and entered an order directing the physical therapist to contact him upon returning to the facility. Id.

On March 25, 2021, Barnes presented to a nurse with complaints of acute thoracic and lumbar pain, chronic pain, and muscle tightness. VDOC-305. Dr. Mullins examined him four days later, and noted that his physical examination revealed only tenderness. VDOC-306. Dr. Mullins prescribed Flexeril and directed Barnes to return for a follow-up appointment in fourteen days. Id.

On April 19, 2021, Barnes spoke to a nurse and requested to see a physician for decreased range of motion. VDOC-307. The nurse noted that Barnes had a steady gait and that he exhibited no signs of disability or distress. Id.

Barnes was examined by Dr. Mullins on April 28, 2021, at which time he reported that the prescribed medications did not help. VDOC-308. Dr. Mullins discontinued the prescription for Motrin and referred Barnes for physical therapy. Id. As of June 8, 2021, Barnes had undergone three additional physical therapy sessions, and his medical care and treatment remained ongoing. Mullins Decl. ¶¶ 100–103.

## II.    Procedural History

On October 28, 2020, Barnes filed this action under 42 U.S.C. § 1983, alleging that Dr. Mullins and Dr. Smith acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment. In particular, Barnes alleges that Dr. Mullins violated the Eighth Amendment by (1) failing to respond to his complaints of pain and muscle tightness; (2) failing to address his complaints that prescribed medications did not alleviate his pain; (3) prescribing ineffective medications; (4) failing to provide treatment from October 7, 2019 to

11

December 12, 2019; (5) failing to follow through on the decision to prescribe exercises; and (6) failing to treat his "functional scoliosis." Compl. ¶¶ 71–75, 81. Similarly, Barnes alleges that Dr. Smith violated the Eighth Amendment by (1) failing to provide pain management treatment from January 9, 2019 to May 1, 2019; (2) prescribing Motrin even though Barnes reported that the medication was ineffective; (3) failing to follow through on plans to order an MRI, refer Barnes to a neurologist, and transfer him to another facility; (4) failing to respond to his complaints of pain, muscle stiffness, and muscle tightness; (5) failing to address his complaints that prescribed medications were ineffective; and (6) failing to treat his "functional scoliosis." Id. ¶¶ 76–81.

On June 9, 2021, Dr. Mullins and Dr. Smith moved for summary judgment. On August 23, 2021, Barnes filed a motion for summary judgment against Dr. Mullins, and on February 23, 2022, he filed a motion for summary judgment against Dr. Smith. The motions have been fully briefed and are ripe for disposition.

## III.    Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson, 477 U.S. at 248–49).

12

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citations omitted). In considering each motion, "the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." Id. To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. Anderson, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

## IV.    Discussion

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. "Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) (citing Scinto v. Stansberry, 841 F.3d 219, 236 (4th Cir. 2016)). An Eighth Amendment violation occurs when a prison official "demonstrates 'deliberate indifference' to an inmate's serious medical needs." Id. (citations omitted); see also Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) ("A prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.").

13

A claim for deliberate indifference has two components. Heyer v. United States Bureau of Prisons, 849 F.3d 202, 209 (4th Cir. 2017). "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." Id. In this case, Dr. Mullins and Dr. Smith do not challenge whether Barnes's back issues were objectively serious. Instead, the parties dispute whether Dr. Mullins and Dr. Smith acted with deliberate indifference to Barnes's serious medical needs.

The United States Court of Appeals for the Fourth Circuit has explained that "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" Jackson, 775 F.3d at 178 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This standard is "exacting," and it requires more than "mere negligence or even civil recklessness." Id. (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). To rise to the level of an Eighth Amendment violation, "it is not enough that an official should have known of a risk." Id. Rather, the official "must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Id. "The subjective component therefore sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). To find a defendant liable, "the treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Hixson v. Moran, 1 F.4th 297, 303 (4th Cir. 2021) (quoting Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990)).

Applying these standards, the court concludes that Dr. Mullins and Dr. Smith are entitled to summary judgment. First, no reasonable jury could find that Dr. Mullins or Dr. Smith intentionally denied treatment for Barnes's back issues. See Formica v. Aylor, 739 F. App'x 745, 754 (4th Cir. 2008) (noting that the "necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care) (emphasis omitted) (citing Estelle, 429 U.S. at 104–05). The medical records establish that Dr. Mullins and Dr. Smith personally examined Barnes on numerous occasions; that they prescribed multiple medications in an effort to alleviate his pain and discomfort; that Dr. Mullins ordered a consultative orthopaedic examination; and that he twice referred Barnes for physical therapy. To the extent Barnes disagrees with the treatment decisions made by Dr. Mullins and Dr. Smith, the Fourth Circuit has "consistently found such disagreements [between an inmate and a physician over the inmate's proper medical care] to fall short of showing deliberate indifference." Jackson, 775 F.3d at 178.

Second, no reasonable jury could find that Dr. Mullins or Dr. Smith "intentionally treated him incorrectly[] or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Domino v. Texas Dep't of Crim. Justice, 239 F.3d 752, 756 (5th 2001). Although Barnes faults the physicians for prescribing Motrin even though Barnes reported that the medication was ineffective, it is undisputed that the orthopaedic specialist informed Dr. Mullins that Barnes does not need "anything else except ibuprofen or Tylenol" as needed for pain. Mullins Decl. ¶ 38; see also Pl.'s Br. Opp'n, ECF No. 46, at 6 (acknowledging that this is "undisputed"). Moreover, the mere fact that Motrin and the various

other medications prescribed by Dr. Mullins and Dr. Smith did not alleviate Barnes's pain and discomfort is insufficient to establish that either physician acted with deliberate indifference. Courts have repeatedly held that "evidence of unsuccessful medical treatment, such as the inability to reduce pain, is insufficient to establish deliberate indifference" on the part of a treating physician. Shiheed v. Hoover, No. 1:20-cv-01040, 2021 U.S. Dist. LEXIS 118973, at *32 (D. Md. Jan. 25, 2021) (quoting Robinson v. Unknown Name Pers. in Charge, No. 8:19-cv-02997, 20121 U.S. Dist. LEXIS 4805 (D. Md. Jan. 11, 2021)); see also Sanchez v. Oliver, 995 F.3d 461, 473 (5th Cir. 2021) (emphasizing that unsuccessful medical treatment does not constitute deliberate indifference) (internal quotation marks and citation omitted); Norwood v. Ghosh, 723 F. App'x 357, 356 (7th Cir. 2018) (noting that while the plaintiff "was not satisfied with the pain treatment he was receiving," the treatment of pain "allows considerable room for professional judgment," and "[m]edical professionals cannot guarantee pain-free lives for their patients").

Third, no reasonable jury could find that Dr. Smith intentionally denied or delayed treatment from January 9, 2019 until May 1, 2019, or that Mullins acted with deliberate indifference by declining to adjust Barnes's prescription regimen between October 7, 2019 and December 12, 2019. During the first four months of 2019, Barnes underwent cervical, thoracic, and lumbar spine x-rays ordered by Dr. Smith; he was referred for a consultative orthopaedic evaluation; and he met with Dr. Smith to discuss the results of that evaluation. Additionally, at the time of Dr. Smith's evaluation on January 9, 2019, Dr. Barnes had already prescribed Mobic for 180 days. To the extent Barnes claims that Dr. Smith was somehow negligent in not providing additional treatment during that time period, "mere negligence is

not enough to show deliberate indifference." Hixson, 1 F.4th at 303. Likewise, to the extent

Barnes disagrees with Dr. Mullins's decision to have him remain on prescribed medications

for a longer period in order to determine their effectiveness, such disagreement is insufficient

to establish deliberate indifference. See Jackson, 775 F.3d at 178.

Finally, no reasonable jury could find that Dr. Smith and Dr. Mullins violated the

Eighth Amendment by failing to order or follow through with other medical tests or treatment

options mentioned in Barnes's medical records, such as an MRI, a referral to a neurologist, a

foam roller, or a heating pad. At the time Dr. Smith mentioned the possibility of a neurology

referral and an MRI, Barnes had not yet undergone the spinal x-rays that were

contemporaneously ordered by Dr. Smith. After those x-rays were performed, Barnes was

referred for an orthopaedic consult, and it is undisputed that the orthopaedic specialist advised

Dr. Mullins that Barnes did not need anything other than Motrin or Tylenol. After Motrin

proved ineffective, however, Dr. Mullins prescribed other medications, including Flexeril,

Naproxen, Elavil, and Robaxin. He also ordered lab work and arranged for Barnes to undergo

physical therapy. Based on the evidence presented, the physicians' failure to arrange for

additional testing or treatment does not rise to the level of deliberate indifference. And as

explained above, "medical malpractice, negligence, or even gross negligence does not equate

to deliberate indifference." Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir. 2006); see also

Montgomery v. Aparatis Dist. Co., 607 F. App'x 184, 188 (3d Cir. 2015) ("At most, delaying

the MRI while other treatment options were pursued suggests mere medical negligence, which

is insufficient to support a constitutional violation."); Galindo v. Altenberg, 552 F. App'x 355,

356 (5th Cir. 2014) ("[E]ven if [the plaintiff] had submitted medical expert reports showing

that the defendants violated the community standard of care by failing to obtain an MRI, negligence, medical malpractice, and disagreements with diagnostic measures are insufficient to give rise to a claim of deliberate indifference."). Additionally, the record reflects that Barnes was not permitted to possess a heating pad or a foam roller at his particular security level, and that Kemp and Dr. Mullins agreed that neither device was required. The fact that Barnes disagrees with their decision is insufficient to establish deliberate indifference. See Germain v. Shearin, 531 F. App'x 392, 395 (4th Cir. 2013) (emphasizing that the standard of deliberate indifference is not satisfied by a "mere disagreement concerning '[q]uestions of medical judgment'") (quoting Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975)).

## V.    Conclusion

For these reasons, the court concludes that no reasonable jury could find that the treatment provided by Dr. Mullins and Dr. Smith was so grossly incompetent as to permit a finding of deliberate indifference. Accordingly, the motion for summary judgment filed by Dr. Mullins and Dr. Smith, ECF No. 37, is **GRANTED**, and Barnes's motions for summary judgment, ECF Nos. 51 and 65, are **DENIED**. An appropriate order will be entered.

Entered: March 31, 2022

Michael F. Urbanski
Chief U.S. District Judge
2022.03.31 12:46:13 -04'00'

Michael F. Urbanski
Chief United States District Judge

18